## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FILED

JAN 2 1 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | | |
|---|---|---|
| RIDOUANE KHALID, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Case No. 1:04-1142 (RJL) |
| | ) | |
| GEORGE WALKER BUSH, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| ———————————————— | ) | |
| | ) | |
| LAKHDAR BOUMEDIENE, et al., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Case No. 1:04-1166 (RJL) |
| | ) | |
| GEORGE WALKER BUSH, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| ———————————————— | ) | |

## MEMORANDUM OPINION AND ORDER
(January 19, 2005) [#25]

Petitioners are seven foreign nationals who were seized by United States forces

and have been detained at the United States naval base at Guantanamo Bay, Cuba

("Guantanamo") pursuant to military orders arising out of the ongoing war against terror

initiated in the aftermath of September 11, 2001 ("9/11"). Based on the Supreme Court's

decision in *Rasul v. Bush*, 124 S. Ct. 2686 (2004), each detainee has filed a petition for a

writ of habeas corpus with this Court seeking to challenge the lawfulness of his continued



-1-

detention.  Each petitioner claims, in essence, that he is being held in violation of the United States Constitution, certain federal laws and United States treaties, and certain international laws.  In stark contrast, the respondents ("United States") have moved to dismiss these petitions claiming, in essence, that there is no viable legal theory by which this Court could issue such a writ because: (1) non-resident aliens detained under these circumstances have no rights under the Constitution; (2) no existing federal law renders their custody unlawful; (3) no legally binding treaty is applicable; and (4) international law is not binding under these circumstances.

Thus, these cases pose the novel issue of whether there is any viable legal theory under which a federal court could issue a writ of habeas corpus challenging the legality of the detention of non-resident aliens captured abroad and detained outside the territorial sovereignty of the United States, pursuant to lawful military orders, during a Congressionally authorized conflict.

After due consideration of the respondents' Motion, the petitioners' individual and joint oppositions, oral arguments and various supplemental briefs, the Court, for the following reasons, concludes that no viable legal theory exists by which it could issue a writ of habeas corpus under these circumstances.  Accordingly, the Court GRANTS the respondents' Motion to Dismiss or for Judgment as a Matter of Law, and, therefore, will not issue the writs of habeas corpus.

# I. BACKGROUND[1]

On 9/11, members of the al Qaeda terrorist network orchestrated the most devastating terrorist attack in the history of the United States when they hijacked and plunged three commercial airliners into the World Trade Center, the Pentagon, and an open field in rural Pennsylvania. Approximately 3,000 innocent civilians were killed that day and the United States economy was severely damaged.

In response, Congress overwhelmingly passed a joint resolution authorizing the President to:

> [U]se all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Authorization for Use of Military Force, Pub. L. 107-40, §§ 1-2, 115 Stat. 224 (Sept. 18, 2001) (hereinafter "AUMF"). Capturing and detaining enemy combatants, however, was not specifically referenced as a necessary and appropriate use of force therein.

The events of 9/11 and the passage of the AUMF was followed by immediate Executive action. First, the President sent United States Armed Forces into Afghanistan to commence a military campaign against al Qaeda and the Taliban regime that supported it. Soon thereafter, on November 13, 2001, the President issued an Order on Detention,

---

[1]     The following facts were drawn from the petitions, various affidavits, and other supporting materials submitted by the petitioners.

Treatment, and Trial of Certain Non-Citizens in the War against Terrorism, November 13,

2001, 66 Fed. Reg. 57,833 (2000) (hereinafter "Detention Order").

The Detention Order authorizes the Secretary of Defense, Donald Rumsfeld, to

detain anyone that the President has "reason to believe":

> (i)    is or was a member of the organization known as al Qaeda;
>
> (ii)   has engaged in, aided or abetted, or conspired to commit, acts of
>        international terrorism, or acts in preparation therefor, that have
>        caused, threatened to cause, or have as their aim to cause, injury to or
>        adverse effects on the United States, its citizens, national security,
>        foreign policy, or economy; or
>
> (iii)  has knowingly harbored one or more individuals described in
>        subparagraphs (i) or (ii)[.]

Pursuant to this order, the United States has targeted and captured, to-date, a large

number of foreign nationals both on and off the battlefields of Afghanistan and

transported them for detention to Guantanamo Bay, Cuba.  In addition, the military has

determined that many of these individuals should be detained for the duration of the

conflict as "enemy combatants."[2]  At present, the Department of Defense ("DoD") is

---

[2]     The scope of the term "enemy combatant" has prompted much debate. *Hamdi v. Rumsfeld*, 124 S. Ct. 2633, 2639 (2004) (noting "the Government has never provided any court with the full criteria that it uses in classifying individuals as [enemy combatants.]").  In July 2004, the Government adopted the following definition, which it now applies to foreign nationals held at Guantanamo:

> [A]n individual who was part of or supporting Taliban or al Qaeda forces, or
> associated forces that are engaged in hostilities against the United States or its
> coalition partners.  This includes any person who has committed a belligerent act
> or has directly supported hostilities in aid of enemy armed forces.

holding nearly 550 of these foreign nationals at Guantanamo, although recent media

reports indicate that the DoD intends to release or transfer hundreds in the near future.

Seven of these foreign nationals are the petitioners in this case.[3] None are United

States citizens or have any connection to the United States, other than their current status

as detainees at a U.S. military base.[4] To the contrary, the petitioners are non-resident

aliens captured outside of Afghanistan. They include five Algerian-Bosnian citizens

(Lakhdar Boumediene, Mohammed Nechle, Hadj Boudella, Belkacem Bensayah, and

Mustafa Ait Idir), *see* FAP ¶¶ 5-13; one Algerian citizen with permanent Bosnian

residency (Saber Lahmar), *id.* ¶ 15; and one French citizen (Ridouane Khalid), *see* Khalid

Pet. ¶ 2. All, with the exception of Khalid, were captured in Bosnia around October

2001. *See* FAP ¶¶ 24, 28, 30-33, & 35. Khalid was seized in Pakistan sometime during

the early fall of 2001. *See* Khalid Pet. ¶¶ 32, 45. In January 2002, shortly after they were

---

*See* Deputy Secretary of Defense Paul Wolfowitz, Memorandum for the Secretary of the Navy, *Order Establishing Combatant Status Review Tribunal* (July 7, 2004) (hereinafter "CSRT Order").

[3]     Currently before the Court are two separate petitions that were filed by or on behalf of a total of nine detainees held at Guantanamo. *See* First Amended Petition for a Writ of Habeas Corpus (the "Boumediene Petition" or "FAP") ¶ 1; Petition for Writ of Habeas Corpus ("Khalid Pet.") ¶¶ 1-2. Only seven of the original nine petitioners remain.

[4]     The United States occupies Guantanamo pursuant to a 1903 Lease Agreement executed with the Republic of Cuba after the Spanish-American War. Under the Agreement, "the United States recognizes the continuance of the ultimate sovereignty of the Republic of Cuba over the [leased areas]." *See* Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, Art. III, T.S. No. 418. The Lease further provides that "the Republic of Cuba consents that during the period of the occupation by the United States ... the United States shall exercise complete jurisdiction and control over and within said areas." *Id.*

captured and transferred to United States military authorities, the petitioners were transported to Guantanamo, where they currently remain. *See* FAP ¶ 46; Khalid Pet. ¶ 46.

In the wake of the Supreme Court's ruling in *Rasul*, petitioners filed writs of habeas corpus on their own behalf and through certain relatives as their "next friend" (collectively, petitioners and their relatives are referred to herein as "petitioners"). Both petitions raise nearly identical claims, in that they challenge the legality of their detention and the conditions of their confinement under the Constitution, certain federal statutes and regulations,[5] and international law.

In particular, the petitions challenge the President's authority to issue the November 13, 2001 Detention Order, *see* FAP ¶ 58; Khalid Pet. ¶ 77; *see also* Petitioners' Joint Supplemental Opposition Brief ("Pets. Joint Supp. Opp."), pp. 5-12, and, even if legal, they claim it is unconstitutional as applied to them because they have been or are being denied their constitutional rights, *see* FAP ¶ 50; Khalid Pet. ¶ 55. Finally, even if those rights are not being violated, they claim their continued detention violates certain federal statutes and international law. *See* FAP ¶¶ 51-56; Khalid Pet. ¶¶ 57-75, 80-81. In the final analysis, the petitioners are asking this Court to do something no federal court has done before: evaluate the legality of the Executive's capture and detention of non-resident aliens, outside of the United States, during a time of armed

---

[5]     The Khalid Petition states claims for violations of two statutes--the Alien Tort Claims Act, 28 U.S.C. § 1350 and the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*-- which the Boumediene Petitioners did not include as claims in their petition.

conflict.

## II. STANDARD OF REVIEW

The dispositive motion now before the Court is the respondents' Motion to

Dismiss or for Judgment as a Matter of Law ("Motion to Dismiss"). *See* Respondents'

Response to Petitions for Writ of Habeas Corpus and Motion to Dismiss or for Judgment

as a Matter of Law.[6]  The Court will only grant dismissal if "it appears beyond doubt that

[petitioners] can prove no set of facts in support of [their] claim which would entitle

[them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Kowal v. MCI*

*Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  The Court must accept the

well-pleaded facts as they appear in the writ of habeas corpus petition and extend the

petitioners every reasonable inference in their favor. *See Doe v. U.S. Dept. of Justice*,

753 F.2d 1092, 1102 (D.C. Cir. 1985); *Kiely v. Raytheon Co.*, 105 F.3d 734, 735 (1st Cir.

1997).  While the Court construes the petitions liberally in favor of the petitioners, *see*

*Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979), it "need not accept the

inferences drawn by [the petitioners] if such inferences are unsupported by the facts set

---

[6]      The Court notes that it will treat the respondents' Motion to Dismiss within the
traditional framework of FED. R. CIV. P. 12(b)(6).  The Court recognizes, however, that under the
Habeas Rules the respondents are only entitled to respond with a pleading and, therefore, do not
have an absolute *right*, as they would in non-habeas civil litigation, to file a Rule 12(b)(6)
motion. *See* Habeas Rule 4 ("[T]he judge shall order the respondent to file *an answer* or *other
pleading* ....") (emphasis added).  Nevertheless, the Court has the discretion to allow such a
motion where it deems, as it does in this case, that the issues raised are appropriate for summary
resolution. *See* Habeas Rule 4 (Advisory Committee Note) ("For example, the judge may want
to authorize the respondent to make a motion to dismiss ...."); *see also Shariff v. Artuz*, 1998 WL
17734, *1 n.1 (S.D.N.Y. Jan. 16, 1998).

out in the [petitions]." *See Kowal*, 16 F.3d at 1276. Nor is the Court required to accept

any legal conclusions incorporated in the factual allegations set forth by the petitioners.

*Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004). Stated simply, the

petitioners must establish at least one viable legal theory, accepting the facts as they plead

them to be true, under which this Court could issue a writ of habeas corpus challenging

the legality of their detention. For the following reasons, they have failed to do so.

### III. ANALYSIS

The petitioners have essentially mounted a two-front attack on the legality of their

detention. In the first instance, they challenge the President's authority, under either the

Constitution or the AUMF, to issue the Detention Order pursuant to which they are

detained. Next, they contend that even if the President had the authority to issue an order

that would detain them for the indefinite period between now and the completion of the

war, their continued detention violates: (1) each non-resident alien's rights under the

United States Constitution; (2) certain federal laws; (3) certain treaties to which the

United States is a signatory State; and (4) certain international law provisions that have

been incorporated into this country's common law. In the final analysis, petitioners

contend that at least one of these alleged violations constitutes a legal theory which

provides this Court with a viable basis to not only issue a writ of habeas corpus, but to

ultimately find their detention unlawful. For the following reasons, the Court disagrees

and finds no viable legal theory under which it could issue the writ they each seek.

**A.**     *Congress Authorized the President to Capture and Detain Enemy Combatants.*

Petitioners' initial theory challenging the lawfulness of their detention (i.e., that the President's Detention Order is not authorized by either the Constitution or the AUMF) is, for the following reasons, completely without merit.

In drafting the Constitution, the Founding Fathers chose to allocate the rights and duties for securing the Nation's "common defence" between Congress and the President (the political branches). *Compare* U.S. CONST. Art. I, § 8 (enumerating Congress' "war powers"), *with* U.S. CONST. Art. II, §§ 2-3 (enumerating the President's "war powers"). The Constitution specifically gives to Congress the power to "provide for the common Defence," Art. I, § 8, cl. 1; "To raise and support Armies," "To provide and maintain a Navy," *id.* § 8, cls. 12-13; "To make Rules for the Government and Regulation of the land and naval Forces," *id.* § 8, cl. 14, and "To declare War," *id.* § 8, cl. 1. The President, on the other hand, is charged with "tak[ing] Care that the Laws [are] faithfully executed," Art. II, § 3, and is identified as the Commander-in-Chief of the Army and Navy, *id.* § 2, cl. 1. These rights and duties govern the lawful prosecution of an armed conflict from beginning to end. And, in *Ex parte Quirin*, the Supreme Court clearly articulated the relationship between Congress and the President in declaring and prosecuting armed conflict:

> The Constitution thus invests the President as Commander in Chief with the power to wage war which Congress has declared, *and to carry into effect all laws passed by Congress* for the conduct of war and for the government and regulation of the Armed Forces, and all laws defining and punishing

offences against the law of nations, including those which pertain to the conduct of war.

*Ex parte Quirin*, 317 U.S. 1, 26 (1942) (emphasis added).

The President's ability to make the decisions necessary to effectively prosecute a Congressionally authorized armed conflict must be interpreted expansively. Indeed, the Constitution does not delegate to Congress the power to "conduct" or to "make" war; rather, Congress has been given the power to "declare" war.[7] This critical distinction lends considerable support to the President's authority to make the operational and tactical decisions necessary during an ongoing conflict. Moreover, there can be no doubt that the President's power to act at a time of armed conflict is at its strongest when Congress has specifically authorized the President to act. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (noting that the President's powers "fluctuate, depending upon their disjunction or conjunction with those of Congress").[8]

Thus, when Congress, through the AUMF, authorized the President "to use all

---

[7]     In fact, an early draft of the Committee on Detail gave Congress the power to "make" war. *See* 2 M. FARRAND, THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 313, 318-19 (Rev. Ed. 1937). Ultimately, however, the Framers gave Congress the power to "declare" war in order to avoid any confusion over the President's ability to wage or prosecute the war.

[8]     In *Youngstown*, Justice Jackson stated that the relative strength of a President's war power depends on the level of Congressional authorization. Under this model, the President's authority is at its maximum where he acts pursuant to express Congressional authorization. *Youngstown*, 343 U.S. at 635. In the absence of a Congressional grant of authority, the President can only act pursuant to any independent or inherent authority that he possesses under the Constitution. *Id.* at 637. The President's power is at its "lowest ebb" when he acts contrary to the express or implied will of Congress. *Id.* at 637-38.

necessary and appropriate force against those ... persons he determines planned, authorized, committed, or aided the terrorist attacks [of 9/11]" "to prevent any future acts of international terrorism against the United States by such ... persons[,]" *see* AUMF § 2, it, in effect, gave the President the power to capture and detain those who the military determined were either responsible for the 9/11 attacks or posed a threat of future terrorist attacks. Indeed, the President's war powers could not be reasonably interpreted otherwise.

The history of armed conflict in which this Nation has engaged since our inception has firmly established that the President's "war power" *must* include the power to capture and detain our enemies. Indeed, the Supreme Court acknowledged as much in its recent decision in *Hamdi v. Rumsfeld*. *Hamdi v. Rumsfeld*, 124 S. Ct. 2633, 2640 (2004) ("The capture and detention of lawful combatants and the capture, detention, and trial of unlawful combatants, by universal agreement and practice, are important incident[s] of war.") (internal quotations omitted); *see also, e.g., Fleming v. Page*, 50 U.S. (9 How.) 603, 615 (1850) ("As commander-in-chief, [the President] is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual to harass and *conquer and subdue* the enemy.") (emphasis added).

Moreover, the petitioners' contention, in effect, that the President's conduct is illegally excessive because Congress did not *expressly* authorize the detention of enemy

-11-

combatants not captured on or near the battlefields of Afghanistan is fanciful, at best.

The Supreme Court, in *Hamdi*, made clear that specific Congressional authorization of detention is unnecessary "[b]ecause detention to prevent a combatant's return to the battlefield is a fundamental incident of waging war" and, thus, permitted by Congress under the clause of the AUMF authorizing the President to use "necessary and appropriate force."[9] *Hamdi*, 124 S. Ct. at 2641; *see also Dames & Moore v. Regan*, 453 U.S. 654, 678 (1981) ("Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act[.]"). In addition, with respect to the duration of detention, the Supreme Court found that it is an equally clear and well-established principle of the law of war that detention may last for the duration of active hostilities, *Hamdi*, 124 S. Ct. at 2641 (citing Article 118 of the Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, [1955] 6 U.S.T. 3316, 3406, T.I.A.S. No. 3364), and, thus, the Supreme Court interpreted the AUMF to mean that Congress has granted the President the authority to detain enemy combatants for the duration of the current

---

[9]     In *Hamdi*, the petitioner was a United States citizen, who members of the Northern Alliance captured in 2001 on a battlefield in Afghanistan for allegedly supporting the Taliban. *Hamdi*, 124 S. Ct. at 2635-36.

conflict, *id.* ("[W]e understand Congress' grant of authority for the use of 'necessary and appropriate force' to include the authority to detain for the duration of the relevant conflict[.]").[10]

The fact that the petitioners in this case were not captured on or near the battlefields of Afghanistan, unlike the petitioner in *Hamdi*, is of no legal significance to this conclusion because the AUMF does not place geographic parameters on the President's authority to wage this war against terrorists. Thus it is unmistakable that Congress, like the Supreme Court in *Quirin*, concluded that enemies who have committed or attempted to commit acts of violence outside of the "theatre or zone of active military operations" are equally as "belligerent" as those captured on the battlefield. *See Quirin*, 317 U.S. at 38. As the respondents aptly observe, the 9/11 attacks were orchestrated by a global force operating in such far-flung locations as Malaysia, Germany, and the United Arab Emirates. *See* Mot. to Dismiss, p. 14 (citing *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States*, 156-68, 236-37 (2004)). Any interpretation of the AUMF that would require the President and the military to restrict their search, capture, and detention to the battlefields of Afghanistan

---

[10]    Notwithstanding the foregoing, the Court recognizes petitioners' concern at the prospect of indefinite or perpetual detention. However, as noted, the law of war, as it has been adopted over the years by the political branches, permits detention for the duration of the hostilities. If the current conflict continues for an unacceptable duration, inadequacies in the law of "traditional" warfare may be exposed, *see Hamdi*, 124 S. Ct. at 2641-42 ("If the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war, that understanding may unravel."), requiring a reevaluation of the laws by the *political branches*, not the judiciary.

would contradict Congress's clear intention, and unduly hinder both the President's ability to protect our country from future acts of terrorism and his ability to gather vital intelligence regarding the capability, operations, and intentions of this elusive and cunning adversary. *See* Howard S. Levie, *Prisoners of War in the Int'l Armed Conflict*, 59 Int'l Law Studies 5 at 108-09 (U.S. Naval War College 1977). Indeed, if nothing else, the attacks on 9/11 exposed the weaknesses in, and the importance of, our intelligence gathering capabilities in preventing future terrorist attacks against our country. For this Court to interpret the AUMF as the petitioners contend, would make a mockery of Congress's intent, contradict the President's necessary and natural war powers, and improperly narrow the Supreme Court's ruling in *Hamdi*.

Thus, for all of these reasons, the Court finds that the President's Detention Order was lawful under the AUMF and consistent with his war powers under the Constitution. Accordingly, it will turn now to the petitioners' remaining legal theories by which they seek to challenge the lawfulness of their detention.[11]

## B.    *Non-Resident Aliens Captured and Detained Outside the United States Have No Cognizable Constitutional Rights.*

Petitioners' next theoretical basis for challenging the lawfulness of their continued detention under the habeas statute is their contention that it violates their substantive

---

[11]    In *Hamdi*, the Supreme Court did not decide the issue of whether the President possesses plenary authority to detain enemies under Article II of the Constitution, in the absence of the AUMF. *Hamdi*, 124 S. Ct. at 2639. Because this Court also rests its holding on Congressional authorization, the Court similarly does not reach the question of whether Article II gives the President plenary authority to detain enemies.

-14-

rights under the United States Constitution (e.g., due process, right to confrontation, right to counsel, and protection against cruel and unusual punishment). *E.g.*, FAP ¶¶ 40, 47; Khalid ¶¶ 49, 53; Petitioners Memorandum in Opposition to Respondents' Motion to Dismiss ("Pets. Opp. Mem."), pp. 28-40; Boumediene and El-Banna Petitioners' Supplemental Reply and Opposition to Government's Motion to Dismiss ("Boumediene Supp. Reply"), pp. 32-37.  This argument, of course, *presupposes* that non-resident aliens captured outside of the United States and held at a military base that is not located on sovereign U.S. territory enjoy such rights.  Notwithstanding the Supreme Court's unequivocal and repeated denial of such rights to such non-resident aliens, *see infra*, petitioners cling to an expansive interpretation of the Supreme Court's recent opinion in *Rasul* as authority for this novel proposition.  For the following reasons, the Court rejects the petitioners' interpretation of *Rasul* and, relying upon a long line of Supreme Court opinions, holds that non-resident aliens captured and detained pursuant to the AUMF and the President's Detention Order have no viable constitutional basis to seek a writ of habeas corpus.

The petitioners in this case are neither United States citizens nor aliens located within sovereign United States territory.  To the contrary, they are non-resident aliens, captured in foreign territory, and held at a naval base, which is located on land subject to the "ultimate sovereignty" of Cuba.  *See* Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, Art. III, T.S. No. 418.  Due to their status as aliens outside

-15-

sovereign United States territory with no connection to the United States, it was well established prior to *Rasul* that the petitioners possess no cognizable constitutional rights. *See Johnson v. Eisentrager*, 339 U.S. 763, 783-85 (1950); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936) ("Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens.").

The Supreme Court's opinion in *Eisentrager* is instructive on this point. In *Eisentrager*, twenty-one German nationals were captured in China while assisting Japanese forces during World War II. *Eisentrager*, 339 U.S. at 765-66. The Germans were tried by an American military commission headquartered in Nanking, convicted of violating the laws of war, and transferred to a prison in Germany under the control of the United States Army. *Id.* One of the prisoners, on behalf of himself and the twenty others, sought writs of habeas corpus in the United States District Court for the District of Columbia, claiming violations of the Constitution as the petitioners do in the case at bar. *Id.* at 767. The District Court dismissed for lack of jurisdiction, but our Court of Appeals disagreed and reversed its judgment. *Eisentrager v. Forrestal*, 174 F.2d 961 (D.C. Cir. 1949).

On appeal, the Supreme Court rejected the non-resident alien petitioners' attempt to invoke a "constitutional right" to a habeas petition. The Supreme Court reasoned that the "prisoners at no relevant time were within any territory over which the United States is *sovereign*, and the scenes of their offense, their capture, their trial, and their

-16-

punishment were all beyond the territorial jurisdiction of any court of the United States."
*Eisentrager*, 339 U.S. at 778.

The Supreme Court then engaged in an extensive discussion specifically regarding

the constitutional right to habeas afforded to our citizens, and the absence of such rights

afforded to non-resident aliens. *Id.* at 770-71.[12]  In the final analysis, the lynchpin for

extending constitutional protections beyond the citizenry to aliens was and remains "the

alien's presence within its territorial jurisdiction." *Id.* at 771 ("Mere lawful presence in

the country ... gives [the alien] certain rights[.]").

The Supreme Court, thereafter, repeatedly reaffirmed its holding in *Eisentrager*.

*E.g., Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("It is well established that certain

constitutional protections available to persons inside the United States are unavailable to

aliens outside of our geographic borders."); *United States v. Verdugo-Urquidez*, 494 U.S.

259, 266 (1990) ("Respondent is an alien who has had no previous significant voluntary

connection with the United States, so these cases [conferring constitutional rights on

aliens] avail him not.").  And similarly, our Circuit Court has repeatedly held that a

"foreign entity without property or presence in this country has no constitutional rights,

under the due process clause or otherwise." *32 County Sovereignty Comm. v. Dep't of

State*, 292 F.3d 797, 799 (D.C. Cir. 2002) (quoting *People's Mojahedin Org. of Iran v.*

---

[12]      In highlighting the distinction between citizens and aliens, the Court stated,
"[w]ith the citizen we are now little concerned, except to set his case apart as untouched by this
decision and to make measure of the difference between his status and that of all categories of
aliens." *Eisentrager*, 339 U.S. at 769.

*Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999)); *see also, e.g., Jifry v. F.A.A.*, 370 F.3d

1174, 1182 (D.C. Cir. 2004) ("The Supreme Court has long held that non-resident aliens

who have insufficient contacts with the United States are not entitled to Fifth Amendment

protections."); *Pauling v. McElroy*, 278 F.2d 252, 254 n.3 (D.C. Cir. 1960) ("The non-

resident aliens here plainly cannot appeal to the protection of the Constitution or laws of

the United States.").[13]

Petitioners contend, however, that the *Rasul* majority overruled *Eisentrager* when

it permitted non-resident aliens detained at Guantanamo to file these petitions for a writ

of habeas corpus.  In short, the petitioners contend that *Rasul* also holds that such non-

resident aliens possess substantive due process rights cognizable in habeas, *see* Motion

Hearing Transcript ("Mot. Trans."), p. 38, because such rights are inextricably linked to

the right to file a petition, *see* Pets. Opp. Mem., p. 1.  The Court disagrees.

Nothing in *Rasul* alters the holding articulated in *Eisentrager* and its progeny.  The

Supreme Court majority in *Rasul* expressly limited its inquiry to whether non-resident

---

[13]        Petitioners also argue that Guantanamo is, for all intents and purposes, sovereign
United States territory and, therefore, the non-resident aliens held there should possess the same
constitutional rights as an alien held within the continental United States. *See* Mot. Trans., p. 41.
Under the express terms of the lease between the United States and Cuba, however, Guantanamo
is not a United States sovereignty. *See* Lease of Lands for Coaling and Naval Stations, Feb. 23,
1903, U.S.-Cuba, Art. III, T.S. No. 418 ("[T]he United States recognizes the continuance of the
ultimate sovereignty of the Republic of Cuba over the [leased areas]...."). Therefore, unless and
until such time as the political branches renegotiate the terms of the lease to alter this status, *see*
*Vermilya-Brown Co., Inc. v. Connell*, 69 S. Ct. 140, 142 (1948) ("[T]he determination of
sovereignty over an area is for the legislative and executive departments[.]"), the non-resident,
alien detainees held there do not possess the same legal status as resident aliens.

aliens detained at Guantanamo have a right to a judicial review of the legality of their

detention under the habeas statute, *Rasul*, 124 S. Ct. at 2693 ("The question now before

us is whether the *habeas statute* confers a right to judicial review of the legality of

Executive detention of aliens in a territory over which the United States exercises plenary

and exclusive jurisdiction, but not 'ultimate sovereignty.'") (emphasis added), and,

therefore, did not concern itself with whether the petitioners had any independent

constitutional rights. Indeed, the *Rasul* majority went on to distinguish *Eisentrager* on

grounds that *Eisentrager* was primarily concerned with whether the prisoners had any

*constitutional* rights that could be vindicated via a writ of habeas corpus. *Id.* at 2693-94

("The [*Eisentrager*] Court had far less to say on the question of the petitioners' *statutory*

entitlement to habeas review.") (emphasis in original). Thus, by focusing on the

petitioners' statutory *right* to file a writ of habeas corpus, the *Rasul* majority left intact the

holding in *Eisentrager* and its progeny.

Finally, petitioners' expansive reliance upon *Rasul*'s "footnote 15" for the

proposition that the *Rasul* majority intended to overrule, *sub silentio*, *Eisentrager* and its

progeny is equally misplaced and unpersuasive.[14] *See Rasul*, 124 S. Ct. at 2698 n.15.

Stated simply, footnote 15 must be read in light of the context of the paragraph and

---

[14]     Footnote 15 states, "Petitioners' allegations–that, although they have engaged
neither in combat nor in acts of terrorism against the United States, they have been held in
Executive detention for more than two years in territory subject to the long-term, exclusive
jurisdiction and control of the United States, without access to counsel and without being
charged with any wrongdoing–unquestionably describe 'custody in violation of the Constitution
or laws or treaties of the United States.'" *Rasul*, 124 S. Ct. at 2698 n.15.

opinion in which it is embedded. The paragraph in which it is included specifically focuses on the "question presented" in the case. *Id.* at 2698. The "question presented" in the case was unequivocally limited to: "the narrow ... question whether the United States courts lack ***jurisdiction*** to consider challenges to the legality of the detention of foreign nationals captured abroad ... and incarcerated at Guantanamo ...." *Rasul*, 124 S. Ct. at 2690 (emphasis added). The *Rasul* majority thereafter further emphasized the limitations on its holding in the concluding paragraph of the opinion by stating "[w]hat is presently at stake is only whether the federal courts have ***jurisdiction*** to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing." *Id.* at 2699. Thus, in its own words, the Supreme Court chose to only answer the question of jurisdiction, and not the question of whether these same individuals possess any substantive rights on the merits of their claims. Indeed, the *Rasul* Court expressly acknowledged that it expected that its decision would cause "further proceedings" among the lower courts to consider the very issue that it had not: the "merits of petitioners' claims."[15] *See id.*

---

[15]     It should be noted that this Court's conclusion that *Rasul* has merely separated jurisdiction from an inquiry on the merits comports with the habeas statute on a practical level as well. The habeas statute enumerates a very specific process that the court and parties must follow, which has several distinct and discernable steps. *See* 28 U.S.C. §§ 2241-2255. The first step, the detained's ability to file an application, is easily severable from a decision on the merits regarding the legality of his detention.

Accordingly, for all of these reasons the Court concludes that the petitioners lack any viable theory under the United States Constitution to challenge the lawfulness of their continued detention at Guantanamo.[16]

## C. *Petitioners Have Failed to Identify any United States Law or Treaty the Violation of Which Would Provide a Viable Basis to Grant a Habeas Petition.*

Having no constitutional rights upon which to base the issuance of a habeas petition, petitioners next seek to rely upon alleged violations of certain legal statutes and treaties as the basis for the issuance of a writ. In doing so, of course, they must demonstrate that the violation of that law or treaty would in turn render the petitioners' *custody* unlawful. *See* 28 U.S.C. § 2241(c)(3) ("The writ of habeas corpus shall not extend to a prisoner unless ... [h]e is in *custody* in violation of the Constitution or laws or treaties of the United States[.]") (emphasis added).[17]

---

[16]     Each of the petitioners in this case is currently having his status as an enemy combatant reviewed by the Combatant Status Review Tribunal ("CSRT"). *See* Mot. to Dismiss, p. 31. The Secretary of Defense established the CSRTs in July 2004 in response to the Supreme Court's decisions in *Rasul* and *Hamdi*. *See* Mot. Trans., pp. 6-7. In *Hamdi*, the Court considered the process that is owed under the Constitution for United States citizens detained as enemy combatants. *Hamdi*, 124 S. Ct. at 2648. A plurality of the Court held that Due Process for even United States citizens requires only "notice of the factual basis for the [detainee's] classification, and a fair opportunity to rebut the Government's factual assertion before a neutral decisionmaker." *Id* In this regard, even assuming, arguendo, that the petitioners do possess constitutional rights, which they do not, the Court notes that the CSRTs provide each petitioner with much of the same process afforded by Article 5 of the Geneva Conventions.

[17]     The petitioners also raised a claim for review of their detention under the common law of habeas embodied in 28 U.S.C. § 2241(c)(1). *See* Pet. Jt. Supp. Br., p. 4; Mot. Trans., p. 45-47. Section 2241(c)(1) provides that "[t]he writ of habeas corpus shall not extend to a prisoner unless ... He is in custody under or by color of the authority of the United States ...." The petitioners contend that they need not allege their detainment violates the Constitution or laws or treaties of the United States under § 2241(c)(3) because, under §2241(c)(1), they have

The petitioners, however, have not offered any viable theory relating to any existing federal laws or treaties that could serve as the basis for the issuance of a writ. By and large, their petitions do not contain detainee-specific allegations of mistreatment at the hands of the respondents. Instead, the petitioners have essentially cast their grievances in generalized terms. The crux of the petitioners' allegations is the amorphous contention that their detention somehow violates certain federal laws (e.g., the War Crimes Act, 18 U.S.C. § 2441(a), (c)(1); Alien Tort Claims Act, 28 U.S.C. § 1350), because they: (1) have been held "virtually incommunicado," (2) "have been or will be interrogated repeatedly ... though they have not been charged with an offense," and (3) have been held "in accommodation[s] that fail[] to satisfy both domestic and internationally accepted standards of accommodation for any person subject to detention." *See* FAP ¶ 40; Khalid Pet. ¶ 49.

The mere fact that the petitioners are in custody, of course, does not violate any specific federal statutory law because Congress has not, to-date, enacted any legislation restricting the President's ability to capture and detain alien combatants in the manner applicable to these petitioners. To the contrary, as discussed previously, Congress has authorized the President to use "all necessary and appropriate force" through the AUMF. *See* AUMF § 2. Here, as conceded by the parties, the capture and detention of each

---

common law due process rights to judicial review. *See* Pets. Opp. Mem., pp. 10, 26-27. The Court, however, rejects petitioners' argument on this point based upon its holding, *supra*, that non-resident aliens have no such rights and the habeas statute does not give them more rights than they would otherwise possess under the Constitution.

petitioner was executed pursuant to a *lawful* military order, even if it were based upon

flawed or incomplete intelligence. *See* Mot. Trans., p. 60 (wherein petitioners assert that

they believe that the "continued detention" and the "capture under the circumstances

under which it occurred" made the detention unlawful, but not that the order to capture

the petitioners was itself unlawful). And with respect to their allegations that the

*conditions* of their custody might violate existing United States law, such alleged conduct,

even if it had occurred, and there is no specific allegation that it did, does not support the

issuance of a writ because, though deplorable if true, it does not render the *custody* itself

unlawful.[18] *See, e.g., Miller v. Overholser*, 206 F.2d 415, 419-20 (D.C. Cir. 1953)

---

[18]     Safeguards and mechanisms are in place to prevent such conduct and, if it
occurred, to ensure it is punished. Indeed, as recently as October 2004, Congress enacted
legislation dealing specifically with the standards governing the detention of the foreign prisoners
at Guantanamo. *See* Ronald W. Reagan National Defense Authorization Act for Fiscal Year
2005, *see* Pub. L. No. 108-375, § 1091(a) ("Reagan Act"). In the Reagan Act, which covers
foreign prisoners, Congress reaffirmed the commitment of the United States to ensuring "that no
detainee shall be subject to torture or cruel, inhuman, or degrading treatment or punishment ...."
*Id.* at § 1091(b)(1). To safeguard the interests of these prisoners, Congress emphasized that "[i]t
is the policy of the United States to ... ensure that all personnel ... understand their obligations in
both wartime and peacetime to comply with the legal prohibitions against torture, cruel,
inhuman, or degrading treatment of detainees ...." *Id.* at § 1091(b)(3). Congress, however,
recognized that the punishment of those in violation of the Act is and should remain with the
military and the military judicial process. *See id.* at § 1091(a)(4) ("[T]he Armed Forces are
moving swiftly and decisively to identify, try, and, if found guilty, punish persons who
perpetrated such abuse[.]"); *id.* at § 1091(a)(5) ("[T]he Department of Defense and appropriate
military authorities must continue to undertake corrective action, as appropriate, to address
chain-of-command deficiencies ...."). In this regard, in the first full-scale court-martial resulting
from the Abu Ghraib prison scandal, a military jury recently convicted Army Reserve Spec.
Charles A. Graner, Jr. on five counts of assault, maltreatment and conspiracy in connection with
the beating and humiliation of Iraqi detainees for which he was sentenced to ten years in prison.
*E.g.,* T.R. Reid, *Guard Convicted in the First Trial From Abu Ghraib*, The Washington Post, at
A1 (January 15, 2005).

(distinguishing habeas corpus claims challenging the legality of the petitioner's confinement from habeas claims challenging the conditions of the confinement); *see also, e.g., McIntosh v. U.S. Parole Comm'n*, 115 F.3d 809, 812 (10th Cir. 1997) (holding that § 2241 of the habeas statute governs the constitutionality or legality of the *basis* of the prisoner's custody and not the *conditions* of that custody).

Moreover, the petitioners have chosen to assert claims under federal laws the violation of which do not create a private right of action and, therefore, are not cognizable in habeas.[19] Specifically, they contend their detention violates certain Army Regulations,

---

[19]     While the petitions do contain two claims that would provide a private right of action, (e.g., the Alien Tort Statute and the Administrative Procedure Act), neither of those claims is legally viable. The Khalid Petition contends that the allegations in the habeas application constitute "torture," "cruel, inhuman, or degrading treatment," and "arbitrary arrest and detention," all within the meaning of the Alien Tort Statute ("ATS"), and "arbitrary" and "unlawful" detention within the Administrative Procedure Act ("APA"). *See* Khalid Pet. ¶¶ 60-73, 80-81. The Boumediene Petition only makes an oblique reference to relief under the APA in its "Prayer for Relief." *See* FAP, p. 16 ¶ 10. To the extent these claims are sufficiently raised by either party, they too must be dismissed because the ATS, *as petitioners concede*, does not waive sovereign immunity, *see* Pets. Opp. Mem., p. 44, and because the APA, despite their contention, does not operate to provide a waiver of sovereign immunity for the petitioners' ATS claims.

However, even assuming, arguendo, that petitioners' claims otherwise satisfy the APA criteria and, moreover, are not subject to one of the APA exemptions from the limited waiver of sovereign immunity provided in the statute, this Court still concludes that the APA does not save the petitioners' ATS claims. Section 702 of the APA provides: "[n]othing herein ... affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground ...." The petitioners' seek a declaration that their detention is unlawful based upon the facts of their capture and the conditions of their detention. Granting this relief during a time of armed conflict would, of course, require the Court to inject itself into sensitive matters of foreign affairs, military policy, and other national security areas. As the Court explains at length in this opinion, it would be an impermissible use of judicial power to provide the relief requested by the petitioners and thus these claims must be dismissed as a matter of law. *See Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) ("Whether or not this is, as the District Court thought, a matter so entirely committed to

which provide the "policy, procedures, and responsibilities" for the military with respect

to detainment situations, *see* Army Regulation 190-8 § 1-1.a ("Army Reg."), and the War

Crimes Act, which criminalizes "grave breach[es] in any of the international conventions

signed at Geneva 12 August 1949" committed by United States military personnel, *see* 18

U.S.C. § 2441(c)(1). *See* FAP ¶ 40; Pets' Jt. Supp. Br., p. 32. Neither of these statutes,

however, create a private right of action for a detainee to challenge the legality of their

custody in an habeas proceeding. *See Pharm. Research and Mfrs. of Am. v. Walsh*, 123 S.

Ct. 1855, 1878 (2003) ("Where Congress wishes to allow private parties to sue to enforce

federal law, it must clearly express this intent."). Indeed, these provisions, at most,

address the punishment available for those who would violate them. *Cf. Branch v Smith*,

123 S. Ct. 1429, 1456 (2003) (noting that §§ 2a(c) and 2c of the current statutory scheme

governing apportionment of the House of Representatives only "address the remedy that a

federal court must order if it finds a violation of a constitutional or statutory right").

Accordingly, for all of the above reasons, the Court concludes that the petitioners have

failed to advance any legal theory based upon federal law, by which the lawfulness of

their continued detention could be questioned.

Similarly, petitioners have offered no viable theory regarding any treaty that could

serve as the basis for the issuance of a writ. Although the petitioners assert that their

---

the care of the political branches as to preclude our considering the issue at all, we think it at
least requires the withholding of discretionary relief.").

continued detention violates the Geneva Convention, *see* FAP ¶ 40; Khalid Pet. ¶ 48, they

subsequently conceded at oral argument that that Convention does not apply because

these petitioners were not captured in the "zone of hostilities ... in and around

Afghanistan." Mot. Trans., pp. 98-99; *see also* Boumediene Supp. Reply, p. 26. As a

result, petitioners are left contending that their detention unlawfully violates other United

States treaties because their living conditions, in effect, constitute "torture" as that term is

defined in the Convention Against Torture and Other Cruel, Inhuman or Degrading

Treatment or Punishment, G.A. Res. 46, U.N. GAOR 39th Sess., Supp. No. 51, at 197,

U.N. Doc. A/RES/39/708 (1984), *reprinted in* 23 I.L.M. 1027 (1984) ("CAT") and the

International Covenant on Civil and Political Rights, G.A. Res. 2200A (XXI), U.N.

GAOR, 21st Sess., Supp. No. 16, at 52, U.N. Doc. A/6316 (1966) ("ICCPR").[20] *See* Pet.

Jt. Supp. Br., pp. 32-35. For the following reasons, however, these claims are not a viable

basis in a habeas proceeding to evaluate the legality of the petitioners' detention.

Treaties, as a general rule, are not privately enforceable. Indeed, enforcement in

the final analysis is reserved to the executive authority of the governments who are parties

---

[20]    Petitioners referenced a virtual patchwork quilt of other international agreements, including the American Declaration on the Rights and Duties of Man ("ADRDM"), art. I, O.A.S. Res. XXX (1948), O.A.S. Off. Rec. OEA/Ser. L./V/I.4 Rev. (1965), and the American Convention on Human Rights ("ACHR"), Nov. 22, 1969, 1144 U.N.T.S. 123, 9 I.L.M. 673. *See* FAP ¶¶ 40, 52, & 54; Khalid Pet. ¶¶ 48, 57, & 59; *see also* Pets. Opp. Mem., p. 23 & n.20. These documents, however, have not been ratified by the United States and therefore they do not create binding rights enforceable in habeas. *See Garza v. Lappin*, 253 F.3d 918, 925 (7th Cir. 2001) ("The [ADRDM] ... is an inspirational document which, ... did not on its own create any enforceable obligations .... [The U.S.] has not ratified the [ACHR], and so that document does not yet qualify as one of the 'treaties' of the United States that creates binding obligations.").

to the treaties. *See, e.g., Comm. of the U.S. Citizens Living in Nicaragua v. Reagan*, 859

F.2d 929, 937-38 (D.C. Cir. 1988); *see also The Head Money Cases*, 112 U.S. 580, 598

(1884) ("A treaty ... depends for the enforcement of its provisions on the interest and

honor of the governments which are parties to it .... It is obvious that with all this the

judicial courts have nothing to do and can give no redress."). Where a treaty is not self-

executing, its terms give rise to a private cause of action *only* if Congress enacts

authorizing legislation. *See Whitney, et al. v. Robinson*, 124 U.S. 190, 194 (1888)

("When the stipulations [of a treaty] are not self-executing, they can only be enforced

pursuant to legislation to carry them into effect, ...."). In the absence of a self-executing

treaty and Congressional implementation, the individual does not have standing to assert

the alleged violation in federal court. *See United States v. Tapia-Mendoza*, 41 F. Supp.

2d 1250, 1253 (D. Utah 1999) ("[O]nly signatory nations generally have standing to

enforce treaty provisions absent evidence, considering the document as a whole, that the

signing parties expressly or impliedly intended the treaty to provide independent rights to

citizens of either country.").

In this case, neither the CAT nor the ICCPR is a self-executing treaty. Indeed, in

giving its advice and consent to ratification of both treaties, the Senate expressly declared

that the provisions of both would *not* be privately enforceable. *See* 136 Cong. Rec.

S36,198 (Oct. 27, 1990) (dealing with the CAT); 138 Cong. Rec. S4781-01 (April 2,

1992) (dealing with the ICCPR). Furthermore, Congress has not enacted any

-27-

implementing legislation, with respect to either convention, that would authorize the

petitioners to challenge the legality of their detention in federal court.[21] *See Wesson v.*

*U.S. Penitentiary Beaumont, TX*, 305 F.3d 343, 348 (5th Cir. 2002) ("Habeas relief is not

available for a violation of the [ICCPR] because Congress has not enacted implementing

legislation."). As a result, the petitioners cannot rely on either the CAT or the ICCPR as a

viable legal basis to support the issuance of a writ of habeas corpus. Accordingly, the

Court finds no viable theory based on United States treaties upon which a writ could be

issued.

**D.      *There is No Viable Legal Theory under International Law upon Which This Court Could Issue a Writ of Habeas Corpus.***

Because the petitioners' claims under the aforementioned treaties fail, they are left

to rely in the final analysis on principles of international law for a viable theory by which

to challenge the lawfulness of their detention. This effort, similarly, is to no avail. The

United States Supreme Court, many years ago, established that international law is part of

this country's jurisprudence. *See, e.g., The Paquete Habana*, 175 U.S. 677, 700 (1900)

("International law is part of our law, and must be ascertained and administered by the

---

[21]      Congress has enacted implementing legislation with respect to the CAT, but none of the legislation purports to give the petitioners a private cause of action to challenge the legality of their detention. The implementing legislation, for example, confers standing to sue for (1) aliens that can demonstrate it is "more likely than not" that he or she would be tortured if removed to a particular country, *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), § 2242(b), Pub. L. No. 105-277 (codified as Note to 8 U.S.C. § 1231), and (2) victims of torture who seek damages against individuals whom they allege subjected them, under the authority of a foreign nation, to torture, *see* Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256.

-28-

courts of justice of appropriate jurisdiction ...."); *Banco Nacional de Cuba v. Sabbatino*,

376 U.S. 398, 423 (1964) (same). "[W]here there is no treaty, and no controlling

executive or legislative act or judicial decision," the courts must look to the "customs and

usages of civilized nations." *Paquete*, 175 U.S. at 700. For further guidance regarding

the "norms" of international law, courts and international law scholars look to whether the

standard is "universal, definable and obligatory." *Xuncax v. Gramajo*, 886 F. Supp. 162,

184 (D. Mass. 1995) (holding allegations of torture, summary execution, disappearance,

and arbitrary detention constitute fully recognized violations of international law). Here,

petitioners essentially allege the United States has, in effect, violated international legal

norms by subjecting them to arbitrary and prolonged detention, *e.g.,* FAP ¶¶ 52, 54;

Khalid Pet. ¶ 59, and torture, *e.g,* Khalid Pet. ¶¶ 62. In response, the respondents

acknowledge, as they must, that "torture" is already illegal under existing law and that

United States soldiers are prohibited from engaging in torture. *See, e.g.*, Mot. Trans., p.

82 ("Torture is against U.S. policy."); *see also, e.g.*, Reagan Act, § 1091(6) ("[T]he

Constitution, laws, and treaties of the United States and the applicable guidance and

regulations of the United States Government prohibit the torture or cruel, inhuman, or

degrading treatment of foreign prisoners held in custody by the United States[.]").

However, having concluded that Congress, through the AUMF, has conferred

authority on the President to detain the petitioners, *see supra*, it would be impermissible,

for the following reasons, under our constitutional system of separation of powers for the

-29-

judiciary to engage in a substantive evaluation of the conditions of their detention. Simply stated, it is the province of the Executive branch and Congress, should it choose to enact legislation relating thereto, to define the conditions of detention and ensure that United States laws and treaties are being complied therewith.

It is not surprising that the petitioners have been unable to cite any case in which a federal court has engaged in the substantive review and evaluation they seek of either the military's decision to capture and detain a non-citizen as an enemy combatant, or the conditions under which that combatant was being held. The leading cases dealing with applications for habeas relief *brought by an alien* during a time of war clearly hold that judicial review is limited to the question of whether Congress has given the military the authority to detain or charge the individual as an enemy combatant, rather than whether the military's decision was correct or otherwise supported by the facts. *See, e.g., Ex parte Quirin*, 317 U.S. at 25; *Application of Yamashita*, 327 U.S. 1 (1946); *Eisentrager*, 339 U.S. at 786.

Indeed, the Supreme Court itself in *Yamashita* articulated the governing rule, the underlying rationale, and the resulting limitation on this Court's inquiry in the instant proceedings as follows:

> [O]n application for habeas corpus we are not concerned with the guilt or innocence of the petitioners. We consider here only the lawful power of the commission to try the petitioner for the offense charged. In the present cases it must be recognized throughout that the military tribunals which Congress has sanctioned by the Articles of War are not courts whose rulings and judgments are made subject to review by this Court. ... They are

-30-

tribunals whose determinations are reviewable by the military authorities either as provided in the military orders constituting such tribunals or as provided by the Articles of War. Congress conferred on the courts no power to review their determinations save only as it has granted judicial power 'to grant writs of habeas corpus for the purpose of an inquiry into the cause of the restraint of liberty.' *The courts may inquire whether the detention complained of is within the authority of those detaining the petitioner. If the military tribunals have lawful authority to hear, decide and condemn, their action is not subject to judicial review merely because they have made a wrong decision on disputed facts. Correction of their errors of decision is not for the courts but for the military authorities which are alone authorized to review their decisions.*

*Yamashita*, 327 U.S. at 344-45 (emphasis added).

Thus, even if the petitioners had presented specific legal violations, which they do not, this Court's review would be limited to the legality of the "authority of those detaining the petitioner." *Id.* at 345. In this case, the petitioners have conceded, as they must, that the military orders given to capture and initially detain them were lawful orders. Moreover, the military had the blessing of Congress in seizing and detaining them because the President's Detention Order comports with the authorization conferred by the AUMF. For these reasons, this Court will not probe into the factual basis for the petitioners' detention.

In the final analysis, the Court's role in reviewing the military's decision to capture and detain a non-resident alien is, and must be, highly circumscribed. The Court is well aware of the measures that have been adopted by the political branches--Congress and the Executive--to ensure that abuse does not occur and to ensure these petitioners are given the treatment that they deserve. Indeed, Congress recently enacted the Reagan Act to

-31-

ensure that all United States personnel clearly understand their obligations with respect to the treatment of detainees. *See* Reagan Act, § 1091(b)(3). Conspicuous in its absence in the Reagan Act is any reference by Congress to federal court review where United States personnel engages in impermissible treatment of a detainee. Indeed, any enforcement and/or punishment for impermissible conduct under the Act remains, as it always has, with the Department of Defense and appropriate military authorities. *E.g.*, Reagan Act, § 1091(a)(4) ("[T]he *Armed Forces* are moving swiftly and decisively to identify, try, and, if found guilty, punish persons who perpetrated such abuse[.]") (emphasis added); *id.* § 1091(a)(5) ("[T]he *Department of Defense* and *appropriate military authorities* must continue to undertake corrective action, as appropriate, to address chain-of-command deficiencies and the systemic deficiencies identified in the incidents in question[.]") (emphasis added). In fact, the Act will soon be codified in Title 10 of the United States Code, which is the Title governing the Armed Forces. *See generally* Regan Act, Pub. L. 108-375, 118 Stat. 1811.

Moreover, the absence of federal court review of the conditions of the detention of a non-resident alien is also consistent with the text of the Constitution and other Supreme Court precedent. The Founders allocated the war powers among Congress and the Executive, not the Judiciary. As a general rule, therefore, the judiciary should not insinuate itself into foreign affairs and national security issues. As Justice Jackson eloquently stated:

> The President, both as Commander-in-Chief and as the Nation's organ for
> foreign affairs, has available intelligence services whose reports are not and
> ought not to be published to the world. It would be intolerable that courts,
> without the relevant information, should review and perhaps nullify actions
> of the Executive taken on information properly held secret. Nor can courts
> sit in camera in order to be taken into executive confidences. But even if
> courts could require full disclosure, the very nature of executive decisions
> as to foreign policy is political, not judicial. Such decisions are wholly
> confided by our Constitution to the political departments of the government,
> Executive and Legislative. They are delicate, complex, and involve large
> elements of prophecy. They are and should be undertaken only by those
> directly responsible to the people whose welfare they advance or imperil.
> They are decisions of a kind for which the Judiciary has neither aptitude,
> facilities nor responsibility and which has long been held to belong in the
> domain of political power not subject to judicial intrusion or inquiry.

*Chi. & South. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). While a

state of war certainly does not give the President a "blank check," *see Hamdi*, 124 S. Ct.

at 2650, and the courts must have some role when individual liberty is at stake, *see*

*Mistretta v. United States*, 488 U.S. 361, 380 (1989), any role must be limited when, as

here, there is an ongoing armed conflict and the individuals challenging their detention

are non-resident aliens, *see, e.g., Yamashita*, 327 U.S. at 8-9.

Thus, to the extent these non-resident detainees have rights, they are subject to

both the military review process already in place and the laws Congress has passed

defining the appropriate scope of military conduct towards these detainees. The extent to

which these rights and conditions should be modified or extended is a matter for the

political branches to determine and effectuate through either Constitutional amendments,

federal laws, or treaties with the appropriate international entities. Thus, until Congress

-33-

and the President act further, there is similarly no viable legal theory under international

law by which a federal court could issue a writ.

Accordingly, for this and all the reasons stated above, the respondents' motion to

dismiss must be GRANTED.

## ORDER

It is, this **19**<sup>th</sup> day of January, 2005, hereby

**ORDERED** that the Response to Petitions for Writ of Habeas Corpus and Motion

to Dismiss or For Judgment as a Matter of Law [#25] is **GRANTED**; and it is further

**ORDERED** that the above-captioned cases be, and hereby are, **DISMISSED**;

**SO ORDERED.**

RICHARD J. LEON
United States District Judge